J-S45028-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SCOTT GUTH | : | |
| | : | |
| Appellant | : | No. 1878 EDA 2022 |

Appeal from the Judgment of Sentence Entered April 19, 2022
In the Court of Common Pleas of Northampton County
Criminal Division at No.: CP-48-CR-0002784-2021

BEFORE: OLSON, J., STABILE, J., and MURRAY, J.

MEMORANDUM BY STABILE, J.:                    **FILED APRIL 5, 2023**

Appellant Scott Guth appeals from the April 19, 2022 judgment of sentence entered in the Court of Common Pleas of Northampton County ("trial court"), following his open guilty plea to drug delivery resulting in death.[1] Upon review, we affirm.

The facts and procedural history of this case are undisputed. Briefly, following a fatal fentanyl overdose, Appellant was charged with, and subsequently pled guilty to, the foregoing crime. On April 19, 2022, the trial court sentenced Appellant to 7 to 14 years' imprisonment. On April 26, 2022, Appellant *pro se* moved for post-sentence relief, indicating that he was *without* counsel. On April 29, 2022, the trial court issued an order accepting as timely filed Appellant's April 26 post-sentence motion and directing Appellant to seek

_____

[1] 18 Pa.C.S.A. § 2506(a).

appointment of a public defender. On May 18, 2022, Attorney Molly Heidorn, Office of the Public Defender, Northampton County, filed a praecipe for entry of appearance on Appellant's behalf. On June 3, 2022, Attorney Heidorn filed an amended post-sentence motion, challenging the discretionary aspects of Appellant's sentence. On June 30, 2022, the trial court denied post-sentence relief. Appellant timely appealed. The trial court directed Appellant to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal. Appellant complied, reasserting his challenge to the discretionary aspects of his sentence. In response, the trial court issued a Pa.R.A.P. 1925(a) opinion.

On appeal,[2] Appellant presents a single issue for our review.

[I.] Did the trial court err and abuse its discretion when it imposed a sentence inconsistent with the Sentencing Code and/or contrary to the fundamental norms which underlie the sentencing process, in that said sentence constituted an abuse of discretion because the sentence imposed represented an unreasonable and excessive sentence which failed to consider mitigating factors.

_____

[2] When reviewing a challenge to the trial court's discretion, our standard of review is as follows:

Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion. An abuse of discretion is more than just an error in judgment and, on appeal, the trial court will not be found to have abused its discretion unless the record discloses that the judgment exercised was manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will.

*Commonwealth v. Bowen*, 55 A.3d 1254, 1263 (Pa. Super. 2012) (quoting *Commonwealth v. Cunningham*, 805 A.2d 566, 575 (Pa. Super. 2002)), *appeal denied*, 64 A.3d 630 (Pa. 2013).

Appellant's Brief at 6 (unnecessary capitalizations omitted). At the core, he claims only that his sentence is excessive because the trial court failed to consider mitigating circumstances.

It is well-settled that "[t]he right to appeal a discretionary aspect of sentence is not absolute." *Commonwealth v. Dunphy*, 20 A.3d 1215, 1220 (Pa. Super. 2011). Rather, where an appellant challenges the discretionary aspects of a sentence, an appellant's appeal should be considered as a petition for allowance of appeal. *Commonwealth v. W.H.M.*, 932 A.2d 155, 162 (Pa. Super. 2007). As we stated in *Commonwealth v. Moury*, 992 A.2d 162 (Pa. Super. 2010):

> An appellant challenging the discretionary aspects of his sentence must invoke this Court's jurisdiction by satisfying a four-part test:
>
>> [W]e conduct a four-part analysis to determine: (1) whether appellant has filed a timely notice of appeal, *see* Pa.R.A.P. 902 and 903; (2) whether the issue was properly preserved at sentencing or in a motion to reconsider and modify sentence, *see* Pa.R.Crim.P. [720]; (3) whether appellant's brief has a fatal defect, Pa.R.A.P. 2119(f); and (4) whether there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code, 42 Pa.C.S.A. § 9781(b).

*Id.* at 170 (citing *Commonwealth v. Evans*, 901 A.2d 528 (Pa. Super. 2006)). Whether a particular issue constitutes a substantial question about the appropriateness of sentence is a question to be evaluated on a case-by-case basis. *See Commonwealth v. Kenner*, 784 A.2d 808, 811 (Pa. Super. 2001), *appeal denied*, 796 A.2d 979 (Pa. 2002).

Here, Appellant has satisfied the first three requirements of the four-part *Moury* test.  Appellant filed a timely appeal to this Court, preserved the issue on appeal through his post-sentence motions, and included a Pa.R.A.P. 2119(f) statement in his brief.[3]  We, therefore, must determine only if Appellant's sentencing issues raise a substantial question.

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis.  *Commonwealth v. Paul*, 925 A.2d 825, 828 (Pa. Super. 2007).  We have found that a substantial question exists "when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process."  *Commonwealth v. Phillips*, 946 A.2d 103, 112 (Pa. Super. 2008) (citation omitted), *appeal denied*, 964 A.2d 895 (Pa. 2009).  "[W]e cannot look beyond the statement of questions presented and the prefatory [Rule] 2119(f) statement to determine whether a substantial question exists."  *Commonwealth v. Christine*, 78 A.3d 1, 10 (Pa. Super. 2013), *affirmed*, 125 A.3d 394 (Pa. 2015).

It is settled that this Court does not accept bald assertions of sentencing errors.  *See Commonwealth v. Malovich*, 903 A.2d 1247, 1252 (Pa. Super. 2006).  When we examine an appellant's Rule 2119(f) statement to determine

_____

[3] Rule 2119(f) provides that "[a]n appellant who challenges the discretionary aspects of a sentence in a criminal matter shall set forth in his brief a concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of a sentence."  Pa.R.A.P. 2119(f).

- 4 -

whether a substantial question exists, "[o]ur inquiry must focus on the reasons for which the appeal is sought, in contrast to the facts underlying the appeal, which are necessary only to decide the appeal on the merits." *Commonwealth v. Ahmad*, 961 A.2d 884, 886-87 (Pa. Super. 2008) (quoting *Commonwealth v. Tirado*, 870 A.2d 362, 365 (Pa. Super. 2005)). A Rule 2119(f) statement is inadequate when it "contains incantations of statutory provisions and pronouncements of conclusions of law[.]" *Commonwealth v. Bullock*, 868 A.2d 516, 528 (Pa. Super. 2005) (citation omitted).

Here, as indicated, Appellant essentially asserts in his Rule 2119(f) statement that his sentence is excessive because the court did not consider mitigating factors, such as "his remorse, acceptance of responsibility, and his history of addiction and mental illness." Appellant's Brief at 15. Based on his 2119(f) statement, we conclude that Appellant has failed to raise a substantial question.

As noted, Appellant's excessiveness claim principally is premised on his argument that the trial court failed to consider his mitigating circumstances. In this regard, we have "held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review." *Commonwealth v. Disalvo*, 70 A.3d 900, 903 (Pa. Super. 2013) (quoting *Commonwealth v. Downing*, 990 A.2d 788, 794 (Pa. Super. 2010)); *see also Commonwealth v. Berry*, 785 A.2d 994 (Pa. Super. 2001) (explaining allegation that sentencing court failed to consider certain

mitigating factor generally does not raise a substantial question); ***Commonwealth v. Cruz-Centeno***, 668 A.2d 536, 545 (Pa. Super. 1995) ("[a]n allegation that a sentencing [judge] 'failed to consider' or 'did not adequately consider' certain factors does not raise a substantial question that the sentence was inappropriate,"), ***appeal denied***, 676 A.2d 1195 (Pa. 1996); ***Commonwealth v. Bershad***, 693 A.2d 1303, 1309 (Pa. Super. 1997) (finding absence of substantial question where appellant argued the trial court failed to adequately consider mitigating factors and to impose an individualized sentence). Consistent with the foregoing cases, we conclude that Appellant failed to raise a substantial question with respect to his excessiveness claim premised on inadequate consideration of mitigating factors.[4]

Even if we were to find a substantial question, Appellant still would not be entitled to relief. First, as Appellant himself acknowledges, his sentence of 7 to 14 years' imprisonment is in the bottom end of the standard range. Appellant's Brief 14-15. The imposed sentence also is what his plea counsel

---

[4] Similarly, insofar as Appellant suggests that the trial court abused its discretion in imposing a sentence consecutive to an unrelated sentence he received in Lehigh County, Appellant's Brief at 15, he does not raise a substantial question. We consistently have recognized that excessiveness claims premised on imposition of consecutive sentences do not raise a substantial question for our review. ***See Commonwealth v. Caldwell***, 117 A.3d 763, 769 (Pa. Super. 2015) (*en banc*) (stating, "[a] court's exercise of discretion in imposing a sentence concurrently or consecutively does not ordinarily raise a substantial question[.]"), ***appeal denied***, 126 A.3d 1282 (Pa. 2015); ***see also Ahmad***, 961 A.2d at 887 n.7; ***Commonwealth v. Pass***, 914 A.2d 442, 446-47 (Pa. Super. 2006).

accepted at sentencing. *See* N.T. 4/19/22, at 38 ("The bottom end of the standard range is appropriate."). Second, it is well-settled that "[w]here[, as here,] the sentencing court had the benefit of a presentence investigation ('PSI'),[5] we can assume the sentencing court 'was aware of relevant information regarding the defendant's character and weighed those considerations along with mitigating statutory factors.'" *Moury*, 992 A.2d at 171. Indeed, our review of the sentencing transcript reveals that the trial court heard testimony and argument concerning Appellant's mitigating circumstances and considered the same in crafting his sentence. *See* N.T., Sentencing, 4/19/22, at 5-14, 22-34, 36-38, 40-41. Accordingly, Appellant's sentencing claim based on insufficient consideration of mitigating factors lacks merit. The trial court, therefore, did not abuse its discretion in sentencing Appellant to 7 to 14 years in prison.

Judgment of sentence affirmed.

_____

[5] We note Appellant's PSI report is part of the original record. It should be noted that pursuant to Pa.R.Crim.P. 703 a PSI report is "confidential, and not of public record," which is available only to the authorities or the individuals listed therein. *See* Pa.R.Crim.P. 703. Accordingly, the Northampton County Clerk of Courts should take all necessary steps to preserve the confidential nature of the PSI report by sealing it.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/05/2023

IN THE COURT COMMON PLEAS OF BEAVER COUNTY, PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) CRIMINAL DIVISION<br>)<br>) No. 133 of 2021 |
| v. | )<br>) |
| D'KWAN MARQUIS WISE, | )<br>) |
| Defendant. | )<br>) |

D. FOUSE, J.                                                March 29, 2022

## OPINION

On September 9, 2021, following a jury trial, Defendant was found guilty on thirteen counts of a fourteen-count information: two counts each of Rape by Forcible Compulsion, Rape by Threat of Forcible Compulsion, Sexual Assault, Indecent Assault by Force or Compulsion, and Indecent Assault Without Consent, and one count each of Aggravated Indecent Assault Without Consent, Unlawful Restraint (Involuntary Servitude), and Simple Assault. He was found not guilty on one count of Unlawful Restraint (Risk of Serious Bodily Injury). On December 14, 2021, the Court imposed an aggregate sentence of 30 to 60 years imprisonment. On December 23, 2021, Defendant filed a Post-Sentence Motion. For the reasons set forth below, the Motion is denied.

## ISSUES RAISED

Defendant makes three arguments: (1) that the verdict was against the weight of the evidence; (2) that the Court erred in permitting the jury to hear that the Commonwealth had instructed the victim not to mention her drug use during the preliminary hearing due to an admissibility concern, while not permitting defense counsel to state that the victim lied under oath at the Commonwealth's direction; and (3) that the Court erred in not admitting into evidence a meme that the victim reposted on Facebook two days after the alleged rapes occurred.

## STATEMENT OF FACTS AT TRIAL

The Commonwealth presented evidence that Defendant raped the victim, J.M., two times in the early morning hours of December 25, 2020. Defendant argued that the sex was consensual.

### 1. Kayla Troy

Kayla Troy, a Beaver County 911 dispatcher, testified that she received a 911 call from J.M. at 3:13 a.m. on December 25, 2020. Trial Transcript Vol. II at 77-79; Commonwealth's Exhibit 1. The recorded call was played for the jury. Vol. II at 80; Commonwealth's Exhibit 2. In the call, J.M. stated that she was at her Midland apartment, where she had been raped twice by D'Kwan Wise, who had just left the apartment on foot after trying unsuccessfully to get a ride. Exhibit 2. She said he had come over around 10:00 p.m. and had woken her up around 2:00 a.m. and raped her. *Id.* She said she had asked him to come over to watch a movie. *Id.* When he first tried to get intimate with her, she said no, and he stopped. *Id.* But when he woke her up around 2:00 a.m., she asked him repeatedly to stop and he told her to shut up and forced himself on her. *Id.* She also said he had a gun. *Id.* Ms. Troy testified that this was only the second time in her five years as a 911 dispatcher that she received a call from a victim reporting a rape that had just happened. Vol. II at 80.

### 2. Officer Ross Youree

Officer Ross Youree of the Midland Borough Police Department testified that he responded to J.M.'s 911 call on December 25, 2020. Vol. II at 84-85. When he arrived at her apartment, she was crying and distraught. *Id.* at 86. He testified that, as a patrol officer, he is trained to take only a brief statement from a sexual assault victim, while a more specialized officer would follow up with a detailed interview. *Id.* at 86-87. J.M. stated to Officer Youree that she had invited Defendant over that night to watch a movie and that they had fallen asleep. *Id.* at 87-88. Around 2:00 a.m., Defendant began to touch her sexually and she told him no and pushed him

2

off, but he then held her down, pulled her shorts down, and had sexual intercourse with her. *Id.* She said Defendant then tried to unsuccessfully to find a ride and, when she refused to give him a ride, he became upset and again held her down, placed his hand over her mouth, told her to shut up, and had sex with her a second time. *Id.* at 88-89. She said that, between the two incidents, she had texted a friend and let them know what happened. *Id.* at 89. Officer Youree recommended that J.M. proceed to the hospital for a rape exam and preserve whatever clothing she had been wearing. *Id.* at 90-91. He called an ambulance which took J.M to the hospital. *Id.* at 91.

### 3. Gage Latone

Gage Latone, an inmate at the Beaver County Jail, testified that he had been friends with Defendant for about ten years and with J.M. for six or seven years. Vol. II at 115-17. He introduced Defendant and J.M. to each other in person for the first time on December 23, 2020, when the three of them tried to go to a bar together but called it a night after one of them couldn't get into the bar. *Id.* at 118-19. Mr. Latone authenticated texts he exchanged with J.M. via Facebook Messenger beginning at 2:11 a.m. on December 25. *Id.* at 119-33; Commonwealth's Exhibit 3. In the texts, J.M. told Mr. Latone that Defendant had just raped her and was trying to find a ride. Exhibit 3. She texted that she let Defendant come over to watch a movie, he tried to touch her and she told him no, they fell asleep, and he woke her up touching her and getting on top of her. *Id.* She said "stop I'm not playing" but he ripped her pants off, told her to shut up, and "literally shoved himself inside of" her. *Id.* He put his hand over her mouth and kept telling her to shut up and she couldn't push him off. *Id.* J.M. texted that she felt "so weird" and felt like she was going to throw up. *Id.* She told Mr. Latone that she wanted to call the cops after Defendant left. *Id.*

Mr. Latone responded: "Why would you chill [with] him after I told you I didn't even feel comfortable around him… I'm a grown ass man and I don't feel safe around him." *Id.* J.M. texted that Defendant was now saying he couldn't find a ride and she suggested he walk and said "you

3

gotta leave." *Id.* Mr. Latone advised her not to start freaking out or Defendant might do something, and described Defendant as "really crazy." *Id.* Mr. Latone asked if Defendant had "his gun" and J.M. said she didn't think so. *Id.* Mr. Latone said "Guess he can't kill you at least" and J.M. said "he has 2 hands" and "I got a throat." *Id.* Mr. Latone said "Yo chill this ain't a time for jokes" and J.M. said she was scared Defendant would "beat [her] ass" if she tried to get dressed to go outside. *Id.* Eventually J.M. texted "Bro he [just] did it again" and said she just saw that Defendant did have his gun. *Id.* Mr. Latone advised her to make a run for it and asked her if she wanted him to call the police. *Id.* She said Defendant looked like he was getting ready to leave, and soon said Defendant had just left and she was now calling the cops. *Id.* She texted "he [just] raped me twice no mistake about it at all." *Id.* Mr. Latone said Defendant "might kill you when he find[s] out" J.M. called the police, and she responded "They better put me in protection services in a mansion." *Id.*

On cross examination, Mr. Latone agreed that he was better friends with Defendant than with J.M. Vol. II at 136. He testified that he hung out with J.M. after the December 25 incident and described her as being in a joking mood about what happened. *Id.* at 146-47. Based on his familiarity with J.M.'s personality through years of knowing her, he did not believe that she was acting traumatized. *Id.* at 147-48. He admitted that he had offered to help Defendant by providing this information to defense counsel. *Id.* at 148. On redirect, he denied being on either Defendant's side or J.M.'s side, but admitted he had sent Defendant a message saying "I ain't on her side" and "fuck her for real." *Id.* at 150. He also admitted that, while J.M. had "seemed fine" and "acted like her normal self" a couple of days after the incident, she never said she made the whole thing up or changed her story about what happened. *Id.* at 150-51.

4

### 4. Nurse Estelle Keifer

Estelle Keifer is a registered nurse and certified Sexual Assault Nurse Examiner who testified that she completed J.M.'s sexual assault examination at Heritage Valley Beaver Hospital on December 25, 2020. *Id.* at 157, 160-61; Commonwealth's Exhibit 4. She recorded J.M.'s account of what happened:

> I invited him over the night before to watch a movie. He got there at 9:30. We laid there watching a movie. He tried to touch me a couple of times. He kissed me. Every time he tried to touch me I said no. He asked me to touch him. I said no. I passed out watching the movie. About 2 a.m. I woke up to him touching me. I had my leg over him while I was sleeping and he was touching my vagina. I grabbed his hand [and] told him to stop touching me and I turned around. He kept trying to touch me. I told him I wasn't playing and I was pissed he woke me up. He then rolled over got on top of me between my legs [and] he said he wasn't playing either. He forced my legs up by my head and was laying on top of me. I kept saying his name and to stop. He kept repeating to me to shut up. He kept one hand over my mouth and used the other hand to pull my shorts up. Then he forced himself inside me after he pulled my shorts up. I scratched his neck and his chest trying to push him off. This lasted 2-3 minutes. He tried to put his arm around me after and asked if I wanted him to leave and I said yes. He sat there 15-20 minutes trying to find a [ride]... I sat there on my phone. Then he asked me for a ride. I told him no and to walk wherever he needed to go and he said I had him fucked up. Then he said he had a ride coming in 10 minutes. Then he came around the bed. He got on top of me between my legs again tried to pull my shorts down. I screamed. He put his hand over my throat and mouth told me to shut up. He pushed me into the bed. He told me he was going to punch me. Then he was choking me. He was inside me and it lasted about the same amount of time as the first. Then he left and told me to lock the door behind me. He did have a gun. I saw it sitting on the bed with him. I saw it when he got up... [H]e left and I called the cops.

Vol. II 166-67; Exhibit 4. In response to further questions, J.M. denied that she had used any drugs or alcohol in the past twenty-four hours. Vol. II at 169. She reported that Defendant penetrated her vagina with his penis and finger and that he ejaculated in her vagina. *Id.* at 172. Nurse Keifer examined J.M. and did not notice any bruising or visible injuries. *Id.* at 173-75.

### 5. Officer Mitchell Himes

Officer Mitchell Himes of the Midland Borough Police Department, who is assigned to investigate sexual assault and child abuse cases, testified that he interviewed J.M. on December 26, 2020. Vol. II at 203-205. She told him that she met Defendant through Gage Latone, texted with Defendant on Facebook Messenger throughout December, and met him in person for the first time on December 23 when she hung out with him and Mr. Latone. *Id.* at 207-208, 220. Via Facebook Messenger, she invited Defendant over to watch a movie on December 24. *Id.* at 209, 221. When Defendant arrived at her apartment, she was getting ready to take a bath and she answered the door in a towel. *Id.* at 209. She told Officer Himes that Defendant waited in her room while she took a bath, she came out of the bath in a towel, changed in front of him, and asked him to rub lotion on her back, at which time he kissed her back. *Id.* at 209, 227-28. She did not report that this contact was unwanted. *Id.* at 228. She further reported that she later fell asleep and awoke with Defendant touching her vagina and she told him to stop. *Id.* at 210. He continued and lifted her legs and penetrated her. *Id.* Afterward, Defendant became upset while trying to find a ride and again got on top of J.M., put his hand over her mouth, and penetrated her a second time. *Id.*

Officer Himes testified that he submitted the evidence collected in J.M.'s sexual assault exam to the Greensburg Pennsylvania State Police Crime Lab. *Id.* at 214-15. The parties stipulated that swabs from J.M.'s vagina tested positive for Defendant's DNA. *Id.* at 217-19.

On cross examination, Officer Himes testified that J.M. reported that she asked Defendant to bring marijuana when he came over, and he did so and asked her to roll a blunt. *Id.* at 226. This testimony was elicited only after a sidebar during which Defendant confirmed on the record that he understood that this line of questioning would implicate him in an exchange of illegal narcotics that the Commonwealth would not otherwise be able to introduce into evidence. *Id.* at 222-25.

6

### 6. J.M.

J.M. testified that she had been friends with Gage Latone since around 2014 and met Defendant through Mr. Latone. Vol. III at 7. Before meeting Defendant in person, she texted with him on Facebook Messenger, beginning on December 8, 2020, when he replied to a photo on her Facebook story, describing her as "Exotic" and complimenting her facial features. *Id.* at 8-11, 103; Commonwealth's Exhibit 12; Defense Exhibit A. J.M. described their conversations as "a little flirtatious" but nothing sexual. Vol. III at 8-9, 96. On December 23, J.M. planned to go to Kendrew's bar in Aliquippa with Mr. Latone, who suggested that they invite Defendant after J.M. told him she and Defendant had been messaging each other. *Id.* at 15. J.M. picked up Defendant in her car and had casual, non-flirtatious conversation with him before picking up Mr. Latone as well. *Id.* at 16-17. When they arrived at Kendrew's, Defendant said he didn't have his ID and would just wait in the car. *Id.* at 16. J.M. thought that was weird and didn't want Defendant sitting in her car because she barely knew him, so she suggested they just call it off, and she dropped Mr. Latone then Defendant back off. *Id.* Later that night J.M. and Defendant texted, each saying they felt comfortable and got good vibes from the other, and J.M testified that she started to have a little bit of interest in Defendant after seeing him in person. *Id.* at 17-18.

J.M. and Defendant continued to text the following day, December 24, and she asked if he wanted to watch a Christmas movie that night, and he said yes. *Id.* at 18-21. She asked him if he had marijuana and they made plans for her to purchase a small amount of marijuana from him. *Id.* at 23-25, 121-22. When she got home around 9:00 p.m. that evening, they spoke via Facebook Messenger and Defendant said he would be coming over, but J.M. didn't think he was actually coming, so she texted him "It's cool have a good night." *Id.* at 27, 123. She thought their plans were off, but around 9:30 p.m. he knocked on her door. *Id.* at 28, 123.

7

She answered the door in a towel because she was about to take a bath. *Id.* at 28-29. She told Defendant to wait in her room and roll up the marijuana while she took a bath. *Id.* at 28. He asked if he could join her in the bath and she said no. *Id.* at 29-30. When she got out of the bath, she put on shorts but no shirt or bra, and asked Defendant to rub lotion on her back. *Id.* at 30-31, 126. He did so and kissed her back a little bit, but she testified that she was not looking to have sex that night. *Id.* at 31, 130. They smoked marijuana and then laid under the covers of her bed in a spooning position, neither wearing a shirt, and watched a movie on J.M.'s phone. *Id.* at 32-33. J.M. testified that Defendant tried to put his hand down her pants multiple times and she casually moved his hand away. *Id.* at 33-34, 134-36. Defendant was stopping when she told him to and she felt this activity was playful and not serious. *Id.* at 34. Defendant also said he had an erection and asked her to touch it, and when she said no he accepted it. *Id.* at 34-35. She told him "you're not going to come over here for the first time and think you're going to have sex with me." *Id.* at 36-37.

J.M. fell asleep and woke up at 2:00 a.m. with Defendant touching her vagina. *Id.* at 35-36. She grabbed his hand and told him to stop, saying she was mad he woke her up because she already told him she didn't want to have sex. *Id.* at 36. He got on top of her, she said "stop" and "I'm not playing," and he said "I'm not playing either." *Id.* He put his hand over her mouth and kept telling her to shut up. *Id.* at 37-38. She tried to push him off but couldn't, and told him to stop more than ten times in an unmistakably serious tone. *Id.* at 39. Her knees were pinned against her chest and he pulled her shorts up to her knees. *Id.* at 40. He inserted himself into her vagina and, after being unable to push him off, she gave up and let it happen, and the sex lasted two or three minutes. *Id.* at 41. Afterward he asked if she wanted him to leave—which she took as an indication that he knew what he had done was wrong—and she said yes. *Id.* at 42-43, 47. Defendant began calling people for a ride and J.M. began texting Mr. Latone. *Id.* at 43. She testified that she was scared to call 911 with Defendant still in her apartment but needed to tell someone what

8

happened. *Id.* at 43, 46. Defendant said he was unable to find a ride and J.M. suggested he walk. *Id.* at 47-48. Defendant went to the bathroom and J.M. grabbed a kitchen knife that she kept under her bed. *Id.* at 51-52.

When Defendant came out of the bathroom, he pushed J.M. back down on the bed and got on top of her. *Id.* at 52. She was screaming really loud for him to stop but he was more aggressive this time, slamming his hand over her mouth and ripping her shorts all the way off. *Id.* at 52-53. Her knife was under her pillow but she didn't use it because she was afraid he would turn it on her. *Id.* at 58. He stuck two fingers into her vagina before inserting his penis. *Id.* at 54-55. She was on her back and he wanted her to switch positions, telling her to turn around or he would punch her. *Id.* at 55-56. She turned around, he put his penis back inside her, and he said if she "didn't fuck him back he was going to choke the life out of" her. *Id.* at 56. She didn't move and was scared she was about to die. *Id.* at 56-57. He said "tell me whenever you come" and she said no and the sex ended shortly thereafter. *Id.* at 57. J.M. thought Defendant ejaculated but wasn't sure. *Id.* at 57. Defendant got up and got dressed and J.M. saw his handgun on the bed. *Id.* at 58. Defendant resumed trying to find a ride and J.M. continued to text Mr. Latone what was happening. *Id.* at 59-61. Defendant said he had a ride ten minutes away, told her to lock her door, and left the apartment. *Id.* at 62-63. When he was gone, J.M. locked the door and called the police. *Id.* at 63.

On cross examination, J.M. testified that she couldn't remember which movie they had been watching, but denied that smoking marijuana that day had affected her memory. *Id.* at 137-38. J.M. admitted to smoking marijuana not only with Defendant, but also with her brothers earlier in the day. *Id.* at 138. J.M. acknowledged that she had denied using drugs that day when asked by defense counsel at the January 25, 2021 preliminary hearing. *Id.* at 138-39. The assistant district attorney objected, and in a sidebar indicated that she had instructed J.M. before the preliminary

9

hearing that J.M. was not allowed to mention the drug use because the Commonwealth cannot present evidence of uncharged crimes committed by a defendant, and that the assistant district attorney "never assumed that defense would want us to bring in that their client was selling drugs." *Id.* at 139-41. Defense counsel indicated that she had never been informed that J.M. had been instructed not to mention the drug use during the preliminary hearing, that J.M. had denied using drugs in response to a point-blank question, and that J.M. hadn't been asked about Defendant's drug use. *Id.* at 142-43. The Court stated that it would allow defense counsel's line of questioning, but the assistant district attorney could rehabilitate the witness on redirect by asking her about the direction she was given at the preliminary hearing. *Id.* at 141-43. When cross examination resumed, J.M. acknowledged that she denied drug use while under oath at the preliminary hearing. *Id.* at 143-44. She also acknowledged that she denied drug use to Nurse Keifer during her sexual assault exam, stating that she was scared she would get in trouble, but she honestly reported her drug use to Officer Himes the next day. *Id.* at 78, 187-88. When asked why she denied drug use at the preliminary hearing, J.M. said the assistant district attorney had advised her not to mention drugs. *Id.* at 194-95. She reiterated that on redirect. *Id.* at 205-206. On recross, defense counsel began to ask J.M. to acknowledge that she was telling the jury that the assistant district attorney had directed her to "lie under oath," and the Court sustained the Commonwealth's objection and described defense counsel's statement as "a mischaracterization of the circumstances that we are very well aware of." *Id.* at 214.

On cross examination, J.M. testified that she was traumatized by what happened and felt it had been a violation of her body, but that it didn't change how she feels about her body. *Id.* at 161, 186. She acknowledged that, on December 26, 2020, she posted on Facebook a photograph of herself that showed some cleavage with the caption "Goodmorning." *Id.* at 190-93; Defense Exhibit C. She testified that she posted it to make herself feel confident and live her life like

10

nothing had happened. Vol. III at 192-93. The Court admitted the photo over the Commonwealth's objection, but ruled against defense counsel's introduction of a meme J.M. reposted on Facebook two days after the alleged rapes which stated: "Fuck sex. I'm tryn to be the reason you smile everyday. We still gone fuck tho." *See id.* at 166-85.

### 7.     Detective Robert Heberle

Detective Robert Heberle of the Beaver County Detective Bureau testified that he worked with J.M. in the week following the alleged rapes and attempted to record phone calls between J.M. and Defendant in an effort to elicit incriminating admissions from Defendant. Vol. III at 224-25. Det. Heberle did record a phone call between J.M. and Defendant via Facebook Messenger, but Defendant hung up when J.M. brought up the incident. *Id.* at 229-31; Commonwealth's Exhibit 10. J.M. was instructed not to answer any calls from Defendant without officers present. Vol. III at 232. J.M. ignored some calls from Defendant but engaged in some texting with him in an effort to setup a call that officers could record. *Id.* at 232-36; Commonwealth's Exhibit 11. Defendant's texts included: "I'm a grown man and think how Yu was playing," "And Yu leave me on seen and slandering my name," "Expose |whatever| Yu think Yu exposing," and "I'm done trying I'm really a savage..." Exhibit 11.

### DISCUSSION

Defendant's Post-Sentence Motion raises three issues.

### 1.     Weight of evidence

A "challenge to the weight of the evidence is distinct from a challenge to the sufficiency of the evidence in that the former concedes that the Commonwealth has produced sufficient evidence of each element of the crime, but questions which evidence is to be believed." *Com. v. Kinney,* 157 A.3d 968, 971 (Pa. Super. 2017). "A verdict is against the weight of the evidence only when the jury's verdict is so contrary to the evidence as to shock one's sense of justice." *Com. v.*

11

*Blakeney*, 946 A.2d 645, 652-53 (Pa. 2008). That standard of review is a high one: "When 'the figure of Justice totters on her pedestal,' or when 'the jury's verdict, at the time of its rendition, causes the trial judge to lose his breath, temporarily, and causes him to almost fall from the bench, then it is truly shocking to the judicial conscience.'" *Com. v. Davidson*, 860 A.2d 575, 581 (Pa. Super. 2004) (*quoting Lupi v. Keenan*, 151 A.2d 447, 452-53 (Pa. 1959) (Musmanno, J., dissenting)). The trial judge "only possesses 'narrow authority' to upset a jury verdict on a weight of the evidence claim," and "assessing the credibility of witnesses at trial is within the sole discretion of the fact-finder." *Blakeney* at 652-53.

Here, Defendant argues that the jury's verdict was "against the weight of the evidence presented as a whole such that it shocks one's sense of justice." Post-Sentence Motion at ¶ 4. No specific grounds are stated for this argument, but it can be nothing other than a request for the Court to overturn the jury's assessment of J.M.'s credibility. Such a decision is not within the Court's proper role. "It is the exclusive province of the jury to resolve contradictory testimony and assess credibility." *Com. v. Bishop*, 266 A.3d 56, 68 (Pa. Super. 2021). "A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. Trial judges, in reviewing a claim that the verdict is against the weight of the evidence, do not sit as the thirteenth juror. Rather, the role of the trial judge is to determine that notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice." *Com. v. Widmer*, 744 A.2d 745, 752 (Pa. 2000).

Here, there are no "certain facts" that the Court could re-weigh as to any relevant issue other than J.M.'s credibility. The evidence consisted primarily of J.M. testifying that Defendant raped her twice and five other witnesses testifying that J.M. told them that Defendant raped her twice. The defense attempted to attack J.M.'s credibility in a variety of ways, highlighting perceived

12

inconsistencies as to tangential matters and questioning whether she acted sufficiently traumatized after the incident, but J.M. never wavered in her core allegations. That the jury chose to believe her does not shock the Court's sense of justice.

### 2. Explanations of J.M.'s prior inconsistent testimony

Defendant argues that the Court "erred by allowing" the assistant district attorney "to explain away [J.M.'s] inconsistent testimony about drug use on the night in question by letting the jury hear that [J.M.] was instructed by" the assistant district attorney "not to mention drug use at the preliminary hearing while testifying under oath." Post-Sentence Motion at ¶ 5. Defendant states that defense counsel "was never made aware at the preliminary hearing that [J.M.] was instructed not to mention any drug use," and argues that "Defendant's ability to attack [J.M.'s] credibility by showing that she lied under oath was severely limited by allowing the Commonwealth to explain away her lie by shouldering the blame themselves." *Id.*

When the Court initially overruled the Commonwealth's objection and allowed defense counsel to impeach J.M. with her inconsistent preliminary hearing testimony, the Court stated that the Commonwealth would be able to "rehabilitate" J.M. by asking her about the direction she was given at the preliminary hearing. Vol. III at 140-43. Defense counsel did not oppose this ruling and did not argue that the explanation for the inconsistency was inadmissible. *Id.* The Court is unaware of any authority that would render that explanation inadmissible, or any authority that generally prevents a witness from offering an explanation for inconsistent testimony. Rather, as our Supreme Court has observed, an "impeached witness may always endeavor to explain away the effect of the supposed inconsistency by relating whatever circumstances would naturally remove it." *Com. v. Alessio*, 169 A. 764, 767 (Pa. 1934) (*quoting Wigmore on Evidence*, 2d ed., vol. 5, § 1044 at 501).

Here, J.M.'s inconsistent testimony was not "explained away" by the Commonwealth, but by J.M. herself. Vol. III at 194-95, 205-206. Her explanation was first elicited by defense counsel

13

on cross examination, after defense counsel was fully aware of how J.M. had been instructed at the preliminary hearing. J.M. was asked why she had denied using drugs in her preliminary hearing testimony, and she stated that she had been instructed by the assistant district attorney not to mention drugs. *Id.* at 194-95. She gave the same explanation on redirect examination, testifying that she had been advised that she was not permitted to implicate Defendant in uncharged crimes. *Id.* at 205-206. "When a statement is made from the witness stand which is at variance with an earlier statement made by the same person and an explanation is given as to why the earlier statement was made, the acceptability of this explanation is exclusively for the jury to determine. If the explanation impresses the jury as reasonable, they are at liberty to accept the later testimony." *Alessio* at 766-67. Defendant's ability to attack J.M.'s credibility was limited only by the reasonableness of her explanation, not by any error of the Court.

Defendant also argues that the Court "erred by prohibiting defense counsel from describing [J.M] as having lied about drug use under the Commonwealth's direction," again stating that the Court undercut Defendant's ability to attack J.M.'s credibility. Post-Sentence Motion at ¶ 6. On recross, after J.M. had explained her inconsistent testimony on cross and redirect, defense counsel began to ask J.M. to acknowledge that she was telling the jury that the assistant district attorney had directed her to "lie under oath." Vol. III at 214. The Court sustained the Commonwealth's objection and described defense counsel's statement as "a mischaracterization of the circumstances that we are very well aware of." *Id.*

Prior to closing arguments, the assistant district attorney asked "that there be no further insinuations made during closings about me doing something improper here. I think that's inappropriate, because legally I have to tell people not to bring |certain evidence| in, and I mean those insinuations are inappropriate." Vol. IV at 15. The Court ruled: "I'm not going to limit |defense counsel| in terms of challenging the credibility of the victim in the case in her closing

14

argument, but I am going to say directing that challenge to the Commonwealth attorney I think no. I wouldn't approve of that. I think that that kind of witness preparation occurs all the time, and it would be improper to argue to the jury that somehow the Commonwealth's attorney in this particular instance was acting unethically and encouraging perjury. I don't think under all these circumstances that's a basis for argument in this case." *Id.* at 15-16. As this ruling makes clear, the Court's prohibition against describing J.M. as having lied under oath at the Commonwealth's direction was not a limitation on Defendant's ability to challenge J.M.'s credibility, but rather limited Defendant from imputing improper conduct to the assistant district attorney when no improper conduct occurred.

The assistant district attorney argued that Rule 404(b) of the Pennsylvania Rules of Evidence barred the Commonwealth from introducing evidence that J.M. arranged to purchase marijuana from Defendant or that J.M. and Defendant smoked marijuana together on the night in question, and that it only became admissible when the defense opened the door to it by eliciting that evidence from Officer Himes. Vol. II at 222-25; Vol. IV at 9-12. The assistant district attorney stated: "I tried to keep that out. I am trying to follow what the law is to protect the Defendant's rights. The defense has known that [J.M.] disclosed the drug use from the very beginning, because it's in the police reports. But I also have to tell my witnesses that they cannot say certain things during the trial or it can cause a mistrial for the Commonwealth." Vol. IV at 11-12. "I did not do any of this to protect the victim or not tell the story of the case. I did this to protect the rights of the Defendant, because there can be an inference drawn that if somebody is a drug dealer they are a person more likely to commit a crime or even the fact if somebody is using drugs." *Id.* at 10.

Defense counsel argued that the evidence would have been admissible under the *res gestae* exception. *Id.* at 6; Post-Sentence Motion at ¶ 6. "The *res gestae* exception to the general proscription against evidence of other criminal acts is also known as the 'complete story' rationale,

15

as such evidence is admissible in order to complete the story of the crime on trial by proving its immediate context of happenings near in time and place. Evidence subject to this exception is admissible only where the probative value of the evidence outweighs the tendency to prejudice the jury." *Com. v. Sebolka*, 205 A.3d 329, 344 (Pa. Super. 2019) (internal citations omitted). "This exception is applicable in situations where the distinct crimes were part of a chain or sequence of events which formed the history of the case and were part of its natural development. In other words, the exception applies to prior bad acts which are so clearly and inextricably mixed up with the history of the guilty act itself as to form part of one chain of relevant circumstances, and so could not be excluded on the presentation of the case before the jury without the evidence being rendered thereby unintelligible." *Com. v. Knoble*, 188 A.3d 1199, 1205 (Pa. Super. 2018) (internal citations omitted).

The evidence in question would not have been admissible by the Commonwealth under the *res gestae* exception. It was not necessary to make the story intelligible, and it would have had no probative value to the Commonwealth's case. The Commonwealth would have had to file prior written notice under Rule 404(b)(3) before seeking the admission of the evidence, and the lack of such notice would have indicated to Defendant that the Commonwealth did not intend to introduce it. *See* Vol. IV at 9-11.

Prior to deliberations, when instructing the jury on its duty to assess the credibility of witnesses, the Court stated: "And, by example, I would refer you to testimony relating to the inconsistency of the victim's testimony, that being [J.M.], relating to the marijuana use alleged to have occurred in this circumstance. It is up to you ultimately to determine the value and credibility of that testimony. You did hear evidence in this case that the witness, this witness in particular, may have been instructed to testify in a certain way during a certain procedure. That happens on occasion. Attorneys, both Commonwealth attorneys as well as defense attorneys, have to prepare a

16

witness and sometimes limit a witness in terms of their testimony. At the end of the day it is up to you, the jury, to determine whether the victim in this case gave inconsistent testimony intentionally or perhaps unintentionally or she was told to do so. Also you should be considering the reasonableness of any particular testimony you heard in this case in light of all of the evidence in this case." Vol. IV at 69-70.

### 3. Admissibility of reposted meme

Defendant argues that the Court erred in ruling against the admission into evidence of a meme J.M. reposted on Facebook two days after the alleged rapes which stated: "Fuck sex. I'm tryn to be the reason you smile everyday. We still gone fuck tho." Vol. III at 168; *see id.* at 166-85. Defendant argues that the reposted meme showed J.M.'s "state of mind in the days immediately following the night in question" and was relevant to the jury's decision as to her "credibility in general." Post-Sentence Motion at ¶ 7.

The Commonwealth argued that the meme was inadmissible under Pennsylvania's Rape Shield Law, 18 Pa.C.S. § 3104, which renders a victim's past sexual conduct and reputation inadmissible in sexual assault trials and "is intended to prevent a trial from shifting its focus from the culpability of the accused towards the virtue and chastity of the victim. This protective measure is salient where defendants attempt to utilize evidence of the complainant's alleged promiscuity to bolster their claim of consent." *Com. v. Rogers,* 250 A.3d 1209, 1216 (Pa. 2021) (internal citations omitted). However, "the shield law may not be applied in a manner that violates a defendant's constitutional right to a fair trial, including his right to present evidence and cross-examine witnesses," and may be "unconstitutional as applied in circumstances where the defendant seeks to introduce evidence for reasons unrelated to impugning the complainant's character, and the probative value of that evidence outweighs the danger of unfair prejudice." *Id.* at 1216-17.

17

The Commonwealth also argued that a photograph J.M. posted on Facebook on December 26, 2020 should be inadmissible under the Rape Shield Law. Vol. III at 190-93; Defense Exhibit C. Defense counsel argued that the meme and photograph both showed that J.M. "was comfortable enough and not as traumatized as she may lead you to believe." Vol. III at 183. The Commonwealth argued Defendant only wanted to introduce these items into evidence "because the inference is that she's acting slutty." *Id.*

The Court ruled that the meme was inadmissible under the Rape Shield Law, but admitted the photograph. Vol. III at 181-85. While the Commonwealth argued that the photograph was "sexy," it was not explicitly or overtly sexual and did not directly implicate J.M.'s sexual conduct or reputation. *Id.* at 176-77. J.M. was able to explain why she posted the photograph without having to testify as to her sexual conduct or reputation or her attitude about sex in general, stating merely that she posted it to make herself feel confident and live her life like nothing had happened. Vol. III at 192-93. As such, the photograph posed a minimal danger of unfair prejudice. Although its probative value was also low, it did depict J.M. looking happy the day after the alleged rapes and could be argued as corroborating Gage Latone's testimony that J.M. "seemed fine" and "acted like her normal self" following the incident. *See* Vol. II at 146-51. For these reasons, the Court admitted the photograph.

The meme, however, was both significantly more prejudicial and even less probative. The Commonwealth argued that the meme was protected by the Rape Shield Law because it was a statement of J.M.'s intention to have sex. Vol. III at 181. The Court agrees. The meme directly involved J.M.'s sexual conduct and/or reputation in that it states her attitude toward sex. The attitude stated in the meme could be interpreted as somewhat casual or even promiscuous and, as such, poses a serious danger of unfair prejudice. It is unlikely that J.M. could have testified about why she posted the meme without having to discuss her attitude toward sex, which is neither

18

relevant nor appropriate. On the other hand, the meme's probative value as to J.M.'s credibility is extremely limited. To the extent that it had any non-sexual probative value at all, it would make the same point as the photograph and Gage Latone's testimony—that J.M. was acting normal after the incident—and would therefore be merely cumulative. At best, Defendant could argue the meme shows that J.M.'s general attitude toward sex was not altered by whatever occurred between her and Defendant, but there was no evidence that a rape victim's general attitude toward sex would necessarily be altered after the incident. Defendant presented no expert testimony on that subject, and his argument approaches (as the Commonwealth argued on a related point) an implication "that somebody who was raped is to never have sex again." Vol. III at 163. At worst, the meme would portray J.M. as having a promiscuous mindset two days after the alleged rapes and invite the jury to infer that she is promiscuous generally—the exact situation the Rape Shield Law was enacted to protect against. J.M.'s "virtue and chastity" were not on trial and Defendant cannot attack her credibility by arguing, essentially, that a rape victim should be expected to display more virtue and chastity following her rape.

Defendant relies on *Com v. Killen*, 680 A2d 851 (Pa. 1996), which held that the Rape Shield Law did not bar testimony that an intoxicated complainant made sexually provocative statements to a fireman and emergency room physician and acted in a jovial and flirtatious manner immediately following an alleged sexual assault. The testimony was directly relevant to the defense that the complainant had been sexually aggressive toward the defendant and had fabricated the accusation in retaliation for his rejection of her advances. *Id.* at 853. Our Supreme Court held that "the statements evidence the complainant's state of mind shortly after (and by implication during) her alleged sexual assault and are therefore relevant and admissible to impeach her credibility. The Rape Shield Law was not designed to exclude evidence of a victim's statements to persons which are part of and relevant to the ongoing episode in which the alleged criminal activity takes place."

19

*Id.* at 854. The instant case is distinguishable from *Killen* because the meme was posted two days later and was not evidence of J.M.'s state of mind shortly after or during the incident. It had no direct relevance to Defendant's defense that the sex was consensual and, as discussed above, could not bolster Defendant's attack on J.M.'s credibility without impermissibly attacking her virtue and chastity.

## CONCLUSION

For the foregoing reasons, Defendant's Post-Sentence Motion is denied.

BY THE COURT:

2022 MAR 29 P 12: 50

DALE M. FOUSE
JUDGE

BY THE COURT